FILED26 AUG '24 10:54USDC-ORP

PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Telephone: (503) 947-2704

Plaintiff, appearing Pro Se

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **PRESTON BERMAN,** | Case No: 6:24-cv-01127-MK |
| Plaintiff, | **OPPOSITION TO DEFENDANTS MOTION TO DISMISS** |
| v. | |
| **PSYCHIATRIC SECURITY REVIEW BOARD;** and **ALISON BORT** *in her official capacity as Executive Director of the Oregon Psychiatric Security Review Board,* | |
| Defendants. | |

## LR 7-1 CERTIFICATION

Pursuant to L.R. 7-1, *Pro Se* Plaintiff certifies that they have made a good-faith effort to confer with Defendants Counsel concerning this opposition to defendant's motion to dismiss presently before the court. Correspondence was exchanged and Plaintiff provided a draft copy of the opposition to defendant's motion to dismiss for Defendants Counsel to review on August 21, 2024 The parties have been unable to resolve their differences.

## MOTION

Plaintiff moves this Court for an Order denying ECF No. 23, Defendants' Motion to Dismiss. This motion is supported by the accompanying Introduction and Argument.

## INTRODUCTION

1. First, the Defendants' argument that the Plaintiff should have requested a hearing every six months and appeal each time as allowed by law imposes an unreasonable burden. This process leads to adverse responses from the Board and the Oregon Appeals Court. Especially when the burden of proof would be on the Plaintiff if they requested the hearing.

2. Second, Defendants' reliance on the Eleventh Amendment to claim sovereign immunity is misplaced. The Eleventh Amendment does not apply where federal rights are at issue, particularly when challenging the constitutionality of the Board's actions under the Americans with Disabilities Act (ADA) and the Due Process Clause of the 14th Amendment.

3. Third, the Plaintiff's continued confinement in a highly restrictive environment violates the ADA, as interpreted by the *Olmstead* decision. This decision mandates that individuals with disabilities be placed in the least restrictive setting appropriate to their needs when supported by their treating professionals as stated in ECF No. 1. Complaint Exhibit A.

4. Fourth, the recent modification of OAR 859-010-0005(8) undermines the Plaintiff's Due Process rights by removing the necessary causal link between the mental disorder and dangerous behavior, which could lead to indefinite detention without proper justification.

5. Finally, the repeated denial of Plaintiff's requests for jurisdictional discharge ECF No. 23. Declaration of Jill Schneider in Support of Defendants' Motion to Dismiss

highlights a systemic bias within the PSRB. This bias prevents the release of individuals

who are no longer substantially dangerous, contrary to the principles of fairness and justice.

## ARGUMENT

### A. Unreasonable Burden of Exhaustion

6.  The Defendant's interpretation of the current legal framework places an undue and

    unreasonable burden on the Plaintiff by requiring them to request a hearing every six

    months even though the burden of proof would be on Plaintiff and to appeal each time as

    permitted by law. This requirement is not merely a procedural step; it effectively forces the

    Plaintiff into a cycle of perpetual legal limbo, where they must continually prove that they

    are no longer a substantial danger to others to be considered for release. This process is not

    only burdensome but also prejudicial, as it creates a scenario where the Plaintiff's rights to

    fair consideration and due process are compromised.

7.  The expectation of the defense counsel that Plaintiff request hearings every six months and

    file appeals places the Plaintiff in an adversarial relationship with the Psychiatric Security

    Review Board (PSRB) and the Oregon Appeals Court. These bodies, in turn, may respond

    unfavorably to what they perceive as repetitive or frivolous claims, regardless of the merits

    of the Plaintiff's case. The Plaintiff's legitimate efforts to seek relief and conditional release

    would be met with institutional resistance, which undermines the integrity of the legal

    process and the Plaintiff's right to a fair hearing.

8.  Moreover, the burden of proving eligibility for discharge or conditional release is shifted

    onto the Plaintiff each time they request a hearing. This shift is particularly problematic

    given the complexities of mental health evaluations and the potential for bias in

    assessments conducted under such adversarial conditions. The Plaintiff would essentially

be required to repeatedly relitigate the same issues, with the expectation that they produce new and compelling evidence every six months, a demand that is both unrealistic and unfair.

9. The law, as it stands, fails to account for the cumulative psychological and emotional toll this process takes on the Plaintiff. The Defendant's assertion that Plaintiff should engage frequent in legal battles, compounded by the systemic bias inherent in the repeated denials of release, creates a situation where the Plaintiff's right to due process is not just hindered but effectively denied. The Defendants insistence on this exhaustive process disregards the Plaintiff's well-being and right to a meaningful opportunity to achieve conditional release or discharge.

10. In essence, the The Defendants expectation for frequent hearings and appeals transforms what should be a fair and equitable process into an onerous and often fruitless endeavor. This not only burdens the Plaintiff but also devalues the very legal protections that are supposed to safeguard their rights. It is crucial that the court recognize the unreasonableness of this burden and the adverse effects it has on the Plaintiff's ability to obtain just relief. The exhaustion requirement, as Defendants assert, violates the principles of due process by creating insurmountable obstacles to fair and meaningful review of the Plaintiff's claims.

## B. Jurisdiction and Federal Rights

11. The Defendants argue that the Eleventh Amendment bars the Plaintiff's claims against the Psychiatric Security Review Board (PSRB) and its officials, asserting that the State and its agencies are immune from suits brought in federal court. However, this argument fails to acknowledge the significant exceptions to Eleventh Amendment immunity that are

well-established in federal law, particularly when it comes to challenges based on constitutional violations and federal rights.

12. The Eleventh Amendment generally provides states and their agencies with immunity from suits in federal court, particularly where monetary damages are sought. However, the Plaintiff in this case is not seeking monetary compensation but rather injunctive and declaratory relief. This distinction is crucial because it falls within the recognized exception to Eleventh Amendment immunity as established by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908).

13. Under the *Ex parte Young* doctrine, plaintiffs are permitted to bring suits against state officials in their official capacities for prospective relief that aims to stop ongoing violations of federal law. This exception applies squarely in the present case, where the Plaintiff is challenging the constitutionality of the Board's actions under federal law, specifically the Americans with Disabilities Act (ADA) and the Due Process Clause of the 14th Amendment.

14. The ADA provides clear federal protections against discrimination on the basis of disability, including the right to be free from unjustified institutionalization and to receive services in the most integrated setting appropriate. The Plaintiff's claims are rooted in these federal protections, arguing that the Board's actions have violated these rights by subjecting the Plaintiff to conditions that are more restrictive than necessary and by failing to provide appropriate community-based treatment options as mandated by the ADA and interpreted through the *Olmstead* decision.

15. Additionally, the Plaintiff asserts that the Board's actions have deprived them of their due process rights under the 14th Amendment. The Due Process Clause guarantees that no

person shall be deprived of life, liberty, or property without due process of law. The Plaintiff contends that the procedures employed by the PSRB, including the application of administrative rules that undermine the Plaintiff's ability to secure a jurisdictional release, violate these constitutional guarantees.

16. Given that the Plaintiff seeks injunctive and declaratory relief to remedy ongoing violations of federal rights, this Court retains jurisdiction over these claims despite the Defendants' invocation of the Eleventh Amendment. The relief sought is not punitive or compensatory but rather aimed at ensuring compliance with federal law and safeguarding the Plaintiff's constitutional rights.

17. In sum, the Defendants' reliance on the Eleventh Amendment is misplaced in this context. The *Ex parte Young* exception provides a clear pathway for the Plaintiff's claims to be heard, particularly where, as here, the challenge involves significant issues of federal law and constitutional rights. The Court's jurisdiction is therefore proper, and the Plaintiff's claims should be allowed to proceed.

**C. Violation of the ADA and *Olmstead***

18. The Plaintiff's continued confinement in a restrictive environment when they are not substantially dangerous constitutes a violation of the Americans with Disabilities Act (ADA), particularly as interpreted by the landmark Supreme Court decision in *Olmstead v. L.C.* ex rel. Zimring, 527 U.S. 581 (1999).

The ADA mandates that individuals with disabilities be provided with services in the most integrated setting appropriate to their needs, a principle that has been further clarified and reinforced by the *Olmstead* decision.

19. Under Title II of the ADA, public entities are required to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. The *Olmstead* decision interprets this requirement to mean that unjustified segregation of persons with disabilities constitutes discrimination. It explicitly states that individuals with disabilities have the right to live and receive services in a community setting rather than in institutions, provided that the individual does not oppose such placement, the placement is appropriate, and the services can be reasonably accommodated.

20. In this case, the Plaintiff argues that their continued confinement in a restrictive institutional setting violates these protections. Despite the Plaintiff's demonstrated progress and the potential suitability for a less restrictive environment, the Psychiatric Security Review Board (PSRB) has failed to make reasonable accommodations that would allow the Plaintiff to transition to their community-based setting in Florida. This failure constitutes a violation of the ADA's integration mandate.

21. The *Olmstead* decision makes clear that states are required to provide community-based treatment to persons with mental disabilities when such treatment is appropriate and can be reasonably accommodated. The decision also recognizes that confinement in a restrictive environment, when less restrictive options are available, not only harms the individual by limiting their autonomy but also constitutes unlawful discrimination under the ADA.

22. The Plaintiff's case exemplifies the very issues that *Olmstead* sought to address. The Plaintiff has been subjected to prolonged confinement (9 years total) in a restrictive environment despite evidence that they are suitable for a jurisdictional release under ORS § 161.346(l)(a). The Board's actions, or inactions, in this regard are not merely a

failure to accommodate but a direct contravention of the ADA's mandate to integrate individuals with disabilities into the community to the maximum extent appropriate.

23. Furthermore, the Board's reliance on outdated or overly cautious assessments to justify continued confinement does not satisfy the requirements set forth by *Olmstead*. The decision requires that any determination regarding the placement of individuals with disabilities must be based on current, individualized assessments of the person's needs and abilities, rather than on generalized assumptions or institutional convenience.

24. By continuing to confine the Plaintiff in a restrictive environment without exploring or facilitating less restrictive alternatives, the Board is perpetuating a form of disability-based discrimination that the ADA and *Olmstead* were designed to prevent. The Plaintiff's right to be treated in the least restrictive setting appropriate to their needs is not just a legal formality but a fundamental aspect of their civil rights under federal law.

25. In conclusion, the Plaintiff's ongoing confinement violates the ADA's integration mandate as interpreted by the *Olmstead* decision. The failure to transition the Plaintiff to a less restrictive environment, where appropriate services can be provided, is not only a denial of the Plaintiff's rights but also a clear instance of discrimination. The Court should recognize this violation and take appropriate action to ensure that the Plaintiff is afforded the rights and protections guaranteed by the ADA and *Olmstead*.

**D. Due Process Violation**

26. The recent modification of OAR 859-010-0005(8) represents a significant erosion of the Plaintiff's Due Process rights, as it removes the essential causal link between the Plaintiff's mental disorder and the determination of dangerousness. This change in the administrative

rule has profound implications, potentially leading to indefinite detention without sufficient legal or factual justification.

27. Historically, the determination of whether an individual should remain under the jurisdiction of the Psychiatric Security Review Board (PSRB) hinged on a clear connection between the individual's mental disorder and their dangerousness to others. This causal link was critical in ensuring that decisions regarding continued confinement were based on objective, evidence-driven assessments directly related to the individual's current mental health status and behavior.

28. The modification of OAR 859-010-0005(8), however, dilutes this safeguard by allowing the PSRB to consider dangerousness without necessarily tying it to the individual's mental disorder. The new rule effectively broadens the criteria under which a person can be deemed dangerous, thus expanding the Board's authority to detain individuals without requiring the same rigorous evidence that previously ensured decisions were fair, just, and directly related to the individual's mental condition.

29. This shift poses a serious threat to the Plaintiff's Due Process rights, as it lowers the threshold for continued detention and creates a scenario where individuals can be held indefinitely based on vague or unrelated criteria. The absence of a required causal link means that the PSRB can now justify continued confinement on grounds that may be speculative, arbitrary, or unrelated to the Plaintiff's actual mental health needs or risk to the public.

30. Due Process, a fundamental principle enshrined in the 14th Amendment, requires that any deprivation of liberty, such as confinement under the PSRB, must be conducted in a manner that is fair, reasonable, and justified by clear and convincing evidence. The

modification of OAR 859-010-0005(8) undermines this requirement by allowing for
decisions that are not necessarily grounded in the Plaintiff's current mental health status or
the risk they pose due to that status.

31. Without the causal link, the Plaintiff is deprived of the opportunity to challenge the basis of
their detention effectively. It becomes exceedingly difficult for the Plaintiff to demonstrate
that they no longer pose a danger if the standard for determining dangerousness is no
longer tied directly to their mental disorder. This creates a significant and unjustifiable
barrier to securing conditional release or discharge, further exacerbating the risk of
indefinite detention.

32. Moreover, the lack of a clear connection between mental disorder and dangerous behavior
could lead to decisions that are influenced by factors unrelated to the individual's mental
health, such as societal fears, stigma, or administrative convenience. Such decisions are
inherently arbitrary and violate the core Due Process requirement that deprivations of
liberty be based on individualized and substantiated assessments.

33. In essence, the modification of OAR 859-010-0005(8) transforms what should be a focused
and evidence-based process into one that is overly broad, subjective, and susceptible to
misuse. The Plaintiff's right to a fair and just evaluation is compromised, and the
possibility of indefinite detention without proper legal safeguards becomes a stark reality.

34. The Court must recognize the profound implications of this rule change and its impact on
the Plaintiff's Due Process rights. To preserve the integrity of the legal process and to
ensure that individuals are not unjustly detained, it is crucial that the Court scrutinize this
modification and reaffirm the necessity of maintaining a clear and direct link between an

individual's mental disorder and any determination of dangerousness. Only then can the

Plaintiff's rights be adequately protected, and the principles of Due Process upheld.

**E. Systemic Bias and Denial of Jurisdictional Discharge**

35. The Plaintiff's repeated requests for jurisdictional discharge have been consistently denied

as shown in ECF No. 23. Declaration of Jill Schneider in Support of Defendants' Motion to

Dismiss, revealing a concerning pattern of systemic bias within the Psychiatric Security

Review Board (PSRB) against releasing individuals from its jurisdiction, even when they

no longer pose a substantial danger. This bias is not only unfair but also undermines the

very purpose of the PSRB, which is intended to protect the public while ensuring that

individuals are only confined as long as necessary based on their current mental health

status and behavior.

36. A key principle of justice is that decisions regarding an individual's liberty must be based

on clear, objective, and current evidence. For individuals under PSRB jurisdiction, this

means that continued confinement should be contingent upon an ongoing assessment of

whether they remain a substantial danger to others.

37. The PSRB operates with a predisposition against releasing individuals, regardless of their

actual risk level. Such a predisposition reflects a systemic bias that prioritizes indefinite

confinement over fair and individualized assessments. This bias can stem from various

factors, including institutional inertia, a culture of risk aversion, and societal stigma against

individuals with mental health conditions. Unfortunately, this bias results in decisions that

are more about maintaining the status quo than about genuinely assessing the Plaintiff's

current suitability for community reintegration.

38. The systemic bias within the PSRB is further evidenced by the use of outdated or overly conservative evaluations to justify continued confinement. These evaluations often emphasize past behaviors or hypothetical risks rather than the Plaintiff's current condition and treatment progress. As a result, individuals like the Plaintiff are trapped in a cycle where their past, rather than their present, dictates their future. This approach is fundamentally at odds with principles of justice and rehabilitation, which require that individuals be given a meaningful opportunity to demonstrate their readiness for discharge.

39. Moreover, the repeated denial of jurisdictional discharge has broader implications beyond the Plaintiff's individual case. It perpetuates a culture of hopelessness and frustration among those under PSRB jurisdiction, discouraging them from seeking discharge or conditional release, even when they may be eligible. This culture of denial not only violates the rights of individuals but also undermines the goals of recovery and reintegration, which are central to the mission of mental health treatment.

40. The consistent refusal to grant jurisdictional discharge, despite evidence of Plaintiff's diminished dangerousness, also raises serious concerns about the transparency and accountability of the PSRB's decision-making process. Without clear criteria and a willingness to genuinely consider discharge requests, the PSRB's decisions can appear arbitrary and driven by a desire to minimize perceived risks at the expense of individual rights. This lack of transparency erodes trust in the system and calls into question the fairness of the entire process.

41. The PSRB hearings exhibit a bias towards maintaining jurisdiction due to a preconceived notion that individuals with mental disorders are inherently dangerous. The hearings often

rely heavily on historical data without giving adequate weight to recent improvements or stability shown by the individuals.

42. The inherent bias in PSRB hearings undermines the principle of fair and individualized assessments. This bias can lead to decisions that do not accurately reflect the current mental state and rehabilitative progress of the individual.

43. In the case of *Haidar v. Psychiatric Security Review Board*, 324 Or App 129 (2023), the Oregon Court of Appeals provides a clear example of how the PSRB's decision-making process can be influenced by bias and a lack of objectivity. The court reversed and remanded the PSRB's decision to deny Muriel Elizabeth Haidar's discharge from its jurisdiction, highlighting several critical flaws in the board's reasoning.

44. First, the Court of Appeals emphasized that the PSRB failed to adequately consider the uncontested testimony of the medical professionals who were directly involved in Haidar's care. These professionals, who had treated Haidar for several years, testified that her mental and physical conditions had significantly deteriorated, rendering her highly unlikely to pose a substantial danger to others. Despite this, the PSRB's decision did not meaningfully address or engage with this testimony, which directly contradicted the board's conclusion that Haidar should remain under its jurisdiction. The court found this omission to be a significant failure of the board's duty to base its decisions on a thorough and impartial review of all relevant evidence.

45. Secondly, the court pointed out that the PSRB's decision relied heavily on outdated evidence, including a forensic evaluation from 2015, which did not account for Haidar's considerable decline in the years preceding the 2020 hearing. The PSRB cited exhibits that primarily reflected Haidar's condition before her significant physical and mental

deterioration, which undermined the credibility and relevance of their findings. The Court

of Appeals noted that none of the exhibits the PSRB relied upon adequately addressed

Haidar's more recent condition, rendering the board's decision unsupported by substantial

evidence.

46. Finally, the Court of Appeals criticized the PSRB for its inadequate explanation of why it

chose to continue exercising jurisdiction over Haidar, despite the compelling evidence in

favor of her discharge. The court noted that the PSRB's order lacked sufficient reasoning

and failed to explain its disregard of the expert testimony presented. This lack of substantial

reason suggests a potential bias in the PSRB's decision-making process, where the board

may have been predisposed to maintain jurisdiction without fully considering all the

evidence.

47. The Haidar decision underscores the importance of objective and thorough review

processes within the PSRB, particularly when determining the continued jurisdiction over

individuals who may no longer pose a danger. The court's ruling serves as a reminder that

reliance on outdated information and failure to engage with key evidence can lead to

decisions that do not accurately reflect the current circumstances, thereby calling into

question the fairness and objectivity of the board's decisions.

48. In conclusion, the repeated denial of the Plaintiff's requests for jurisdictional discharge

highlights a systemic bias within the PSRB against releasing individuals from its

jurisdiction, even when they no longer pose a substantial danger. This bias not only violates

the Plaintiff's rights but also undermines the principles of justice and rehabilitation that

should guide the PSRB's work. The Court must recognize this systemic issue and take steps

to ensure that the PSRB conducts fair, unbiased, and individualized assessments in all

cases, allowing individuals who no longer pose a danger the opportunity to reintegrate into the community and regain their liberty.

**F. Conditional Release to Another State: Analysis of OAR 859-070-0035 and the Knotts v. PSRB Case**

49. OAR 859-070-035 provides, "The Board may consider and approve a conditional release plan to have the patient reside out of state."

https://secure.sos.state.or.us/oard/view.action?ruleNumber=859-070-0035

50. In the case *Knotts v. PSRB,* 250 Or App 448, 454, 280 P3d 1030 (2012), the Oregon Court of Appeals addressed the issue of whether the PSRB could conditionally release an individual to another state.

51. Kevin Knotts had proposed a conditional release plan that involved returning to California to live with his parents and receive treatment. The plan was supported by medical professionals who believed Knotts could be adequately supervised and treated in California. Despite this support, the PSRB denied the request, citing concerns about its ability to control and supervise Knotts effectively if he were released out of state. The board specifically noted that the supervision and treatment necessary for Knotts's conditional release were not available in the community at the time, and they were uncomfortable with an initial release to another state where they would have little control over his treatment and supervision.

52. The Oregon Court of Appeals reversed the PSRB's decision, finding that the board's reasoning was not supported by substantial evidence. The court held that an order must be supported by "substantial reasoning," and in this case, the PSRB failed to specify what elements were missing from the conditional release plan or why they would have little

control over Knotts if he were released to California. The lack of detailed reasoning led the court to reverse and remand the case for further consideration.

**G. Unreasonable Delays and Irreparable Harm**

53. According to ORS § 161.341(4), when an application for discharge or conditional release is made, the applicant bears the burden of proving their fitness for discharge or conditional release by a preponderance of the evidence. However, if more than two years have passed since the state last bore the burden of proof on this issue, the responsibility shifts back to the state to prove by a preponderance of the evidence that the applicant is unfit for discharge or conditional release.

54. In the Plaintiff's case, the most recent hearing occurred in October 2023, during which they stipulated to continued jurisdiction. At that time, requesting a conditional release or jurisdictional discharge seemed futile due to the constraints imposed by the prevailing authority. Under the statutory guidelines, the next mandatory PSRB hearing, where the burden of proof will shift back to the state, is scheduled for October 2025. This statutory process results in significant delays, forcing the Plaintiff to endure a two-year wait for a critical hearing. Such delays impose an unreasonable burden on the Plaintiff, subjecting them to ongoing irreparable harm from prolonged and unnecessary institutionalization.

55. Moreover, while the statutory process allows for the burden of proof to shift back to the state if the hospital requests a hearing, this decision is outside the Plaintiff's control. The extended duration between hearings, during which the burden of proof rests on the state, leaves the Plaintiff's constitutional rights and personal liberty unreviewed and infringed upon for a significant period.

56. Even if the Court determines that administrative remedies have not been fully exhausted, exceptional circumstances justify judicial intervention. The statutory delays, particularly with the next hearing not scheduled until October 2025, cause ongoing irreparable harm. Prolonged institutionalization under conditions that do not reflect the Plaintiff's current mental health status or risk level is a pressing issue of justice. The Plaintiff currently suffers from severe anxiety, hopelessness, depression, and significant stress. Additionally, they face extremely limited access to friends and family, restricted food choices, and curtailed freedom of religious association. Recently, the Oregon State Hospital further restricted the Plaintiff's ability to visit with family, announcing on August 1, 2024, that any visits would have to occur behind glass, akin to a county jail setting. This treatment starkly contrasts with the intent of adjudicating the Plaintiff Guilty Except for Insanity, which was to divert them from the criminal justice system; yet, the conditions at OSH more closely resemble a highly restrictive psychiatric jail.

57. The Plaintiff has expressed the following concerns: "I spent over three months in Florida on my first conditional release, utilizing approved PSRB passes. I now have a much better awareness of my symptoms and warning signs, which I addressed in my conditional release proposal and talked about with my Doctor. If I were allowed to go to Florida on conditional release, I believe there would be no elopement risk. My previous elopement was driven by the desire to visit my family in Florida. Remaining in Oregon, isolated with other PSRB clients, is not true community integration. I need mental health support, and having systems in place to maintain my mental health would be significantly beneficial. I am committed to ensuring that the circumstances leading to my offense never reoccur, especially the destabilizing period when I was receiving different medications from various sources. I

have learned from these experiences and want to contribute productively to society. I've been working on digital art that could be a viable way to earn money by selling t-shirts on Amazon, but I cannot pursue this at OSH because it's considered 'using the school computers for business.' OSH should encourage activities that support residents' economic progress. The current reality is that most residents, upon release, are placed on Social Security and forced to live in poverty in group homes."

**H. Support of Dr. Peykanu and Recent Assessments of Mr. Berman**

58. ECF No. 1. Complaint Exhibit A. Dr. Peykanu's progress notes reflect a positive trajectory in the Plaintiff's treatment and overall mental health stability. Plaintiff has demonstrated significant insight into their condition, particularly in managing their bipolar disorder. This insight is evident in the Plaintiff's proactive engagement with both the treatment team and the broader hospital community, including regular Advocacy communication with key medical and administrative figures. The Plaintiff has maintained psychiatric stability, with no recent behavioral issues, and has shown a strong commitment to adhering to prescribed medications and avoiding potential triggers for manic episodes.

59. Additionally, the Plaintiff has shown a keen awareness of the importance of a stable environment and has actively developed and communicated safety plans for community placement. This proactive approach, combined with the Plaintiff's clear understanding of the risks associated with their condition, suggests a readiness to transition to a less restrictive setting, as supported by the treatment team. Dr. Peykanu has noted that Preston continues to make efforts toward consideration at the risk review and PSRB regarding continued jurisdiction, citing improvement in insight and behavioral stability. The Plaintiff has also been able to describe safety plans for community placement, where he would seek

treatment and inpatient supervision if a manic episode were to occur, providing strong
evidence of his commitment to maintaining stability outside of the hospital setting.

60. Furthermore, the Plaintiff has expressed concerns about the potential SRTF level of care,
describing it as overly restrictive and potentially counterproductive. He continues to
advocate for different kinds of relief, including the possibility of a conditional release to
Florida, where he could be closer to family and a strong support network. Dr. Peykanu
acknowledges these concerns and recognizes the Plaintiff's desire to move forward out of
the hospital.

61. In terms of ongoing stability and self-advocacy, the Plaintiff is noted to be doing well,
consistently utilizing privileges without any behavioral issues. Despite the challenges posed
by his situation, the Plaintiff presents a reasonable outlook and maintains a degree of
equanimity, even while acknowledging the significant dysphoria caused by his
circumstances. His engagement with the treatment team is also positive; he regularly
updates Dr. Peykanu about his status, expressing his thoughts in a healthy and appropriate
manner. This includes managing normal frustrations with peers in a prosocial way and
showing a willingness to cooperate with the team's suggestions.

62. Overall, the Plaintiff's treatment trajectory, as documented by Dr. Peykanu, indicates
substantial progress, stability, and a deep commitment to maintaining mental health. Given
the Plaintiff's insight, therapeutic engagement, and extreme caution in managing his
condition, Dr. Peykanu believes that a case can be made for reconsidering the Plaintiff's
continued institutionalization and exploring alternative options, such as conditional release
or transfer of jurisdiction.

## **CONCLUSION**

For the foregoing reasons, I respectfully request that the Court deny DEFENDANTS MOTION

TO DISMISS, ECF No. 23, and proceed to consider the merits of the case. Given the unreasonable

delays, urgent matters of justice, and statutory obligations, judicial intervention is warranted to

address the ongoing harm and violation of plaintiff's rights.


DATED: August 21, 2024.                 Respectfully submitted,

                                        s/ *Preston Berman*
                                        PRESTON BERMAN
                                        2600 Center St. NE
                                        Salem, OR 97301-2669
                                        Telephone: (503) 947-2704

                                        Plaintiff, appearing Pro Se

## CERTIFICATE OF SERVICE

I certify that on August 21, 2024, I served the foregoing OPPOSITION TO

DEFENDANTS MOTION TO DISMISS upon the parties hereto by the method indicated below,

and addressed to the following:

ELLEN F. ROSENBLUM　　　　　　　　 ____ HAND DELIVERY
Attorney General　　　　　　　　　　　 _X_ MAIL DELIVERY
JILL SCHNEIDER #001619　　　　　　　 ____ OVERNIGHT MAIL
Senior Assistant Attorney General　　　　 ____ TELECOPY (FAX)
JAMES M. AARON #132865　　　　　　　 _X_ E-MAIL
Assistant Attorney General　　　　　　　 ____ E-SERVE
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Jill.Schneider@doj.oregon.gov
Email: James.Aaron@doj.oregon.gov

Attorneys for Defendants


DATED: August 21, 2024.　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　 s/ *Preston Berman*
　　　　　　　　　　　　　　　　 PRESTON BERMAN
　　　　　　　　　　　　　　　　 2600 Center St. NE
　　　　　　　　　　　　　　　　 Salem, OR 97301-2669
　　　　　　　　　　　　　　　　 Telephone: (503) 947-2704

　　　　　　　　　　　　　　　　 Plaintiff, appearing Pro Se

PAGE 1 - CERTIFICATE OF SERVICE

Preston Berman
2600 center st NE
Salem, OR 97301



U.S. Courthouse

1000 S.W. Third Ave.,

Portland, OR 97204