FILED 27 MAY '25 11:27 USDC-ORE

PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Telephone: (503) 947-3764

Plaintiff, appearing Pro Se

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **PRESTON BERMAN**, | Case No: 6:24-cv-01127-MTK |
| Plaintiff, | |
| v. | PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE |
| **PSYCHIATRIC SECURITY REVIEW BOARD; ALISON BORT**, in her official capacity as Executive Director of the Oregon Psychiatric Security Review Board, | |
| Defendants. | |

PAGE 1 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................2

I. INTRODUCTION.................................................................................................2

    A. Claim 1: Title II ADA (Unjustified Institutionalization)....................................4

    B. Claim 2: Due Process under Foucha v. Louisiana, 504 U.S. 71 (1992)...............6

II. GOVERNING LEGAL STANDARD..................................................................9

III. UNDISPUTED FACTS SUPPORTING DISCHARGE..................................10

    A. Medical and Legal Chronology.......................................................................10

    B. Clinical Course and Revocations.....................................................................11

    C. Current Psychiatric Stability...........................................................................12

    D. Expert Testimony: Dr. James Peykanu............................................................14

        a. Absence of Dangerous Behavior.................................................................15

        b. Current Risk Management and Insight.........................................................16

        c. Support for Conditional Release..................................................................19

        d. Clinical Motivation and Protective Factors.................................................20

IV. ADA VIOLATION – CLAIM 1........................................................................22

    A. Legal Standard.................................................................................................22

    B. No Clinically Endorsed Less Restrictive Alternative Within Hospital.............23

    C. Prolonged Institutionalization = Segregation..................................................24

V. DUE PROCESS VIOLATION – CLAIM 2 (Foucha).......................................25

VI. RESPONSE TO RULE 56(f) NOTICE............................................................27

    A. No Material Dispute on Core Facts.................................................................27

    B. Legal Questions Predominate..........................................................................28

VII. CONCLUSION.................................................................................................29

PRAYER FOR RELIEF...........................................................................................30

## I. INTRODUCTION

Plaintiff Preston Berman, committed under the jurisdiction of the Oregon Psychiatric Security

Review Board (PSRB) since 2010 following a judgment of Guilty Except for Insanity, brings this

civil rights action pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities

Act. The underlying commitment was imposed by Deschutes County Circuit Court Judge

Thomas A. Balmer for a maximum term not to exceed 20 years, expiring March 4, 2030 (Commit Order, December 8, 2010, ECF No. 23-1 Dec of JS Exh 1; ECF No. 55 at STATE_PROD_000001).

This case arises from the PSRB's continued exercise of jurisdiction despite uncontroverted evidence—endorsed by Plaintiff's treating psychiatrist, the State's own witnesses, and Oregon State Hospital (OSH) treatment staff—that Plaintiff no longer poses a substantial danger to others as a result of mental disorder. Plaintiff seeks discharge under ORS 161.346(1)(a), which mandates release when the individual is no longer currently dangerous due to a qualifying mental condition.

On February 26, 2025, the PSRB held a jurisdictional hearing and declined to terminate control over Plaintiff, notwithstanding the undisputed clinical findings presented. Although the Board endorsed conditional release planning, it failed to discharge Plaintiff or implement the recommended plan. The Board's refusal to terminate jurisdiction—based not on present dangerousness but on speculative concerns about future behavior and environmental structure—violates both state discharge law and federal constitutional protections.

Accordingly, Plaintiff advances two legal claims:

- **Claim One (ADA):** The PSRB has unlawfully segregated Plaintiff in a state hospital setting when community-based care has been clinically endorsed and is safely available, in violation of the integration mandate of Title II of the ADA.

- **Claim Two (Due Process):** The continued deprivation of liberty without evidence of current dangerousness, and over the express recommendations of treating clinicians, violates the substantive due process protections articulated in *Foucha v. Louisiana*, 504 U.S. 71 (1992).

Plaintiff respectfully submits this Supplemental Brief in response to the Court's Rule 56(f) notice (ECF No. 66), demonstrating that there are no genuine disputes of material fact and that summary judgment is required as a matter of law.

## A. Claim 1: Title II ADA (Unjustified Institutionalization)

Plaintiff asserts that the continued control and confinement under the PSRB constitutes unjustified institutionalization in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132. As established in *Olmstead v. L.C.*, 527 U.S. 581 (1999), the ADA prohibits the unnecessary segregation of persons with disabilities when (1) treatment professionals have determined that community placement is appropriate, (2) the individual does not oppose the placement, and (3) the placement can be reasonably accommodated.

Here, all three *Olmstead* criteria are satisfied:

**(1) Clinical Endorsement for Community Placement.** Plaintiff's treating psychiatrist, Dr. James Peykanu, testified unequivocally in favor of conditional release, stating that Plaintiff is "very much" ready for a less restrictive environment and that no clinical barriers exist to community treatment (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 19:13). He confirmed Plaintiff's insight, medication adherence, absence of aggression, and exemplary

PAGE 4 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

behavior over a sustained period (id. at 35:13–35:24). These conclusions are echoed in the OSH

Risk Review Committee's formal endorsement of conditional release readiness (Exhibit 369,

ECF No. 55 at STATE_PROD_002113–002118) and supported by Dr. Peykanu's February 20,

2025 Jurisdictional Report (Exhibit 421, ECF No. 55 at STATE_PROD_002233).

**(2) Plaintiff Seeks Release.** Plaintiff has actively pursued discharge and submitted a personal

conditional release plan at ECF No. 16.1 Exh A, which outlines a structured, community-based

transition involving relocation to Windermere, Florida, reintegration with family, engagement

with local mental health services, and pursuit of higher education or legal advocacy work. Dr.

Peykanu affirmed that this plan reflects Plaintiff's stated intentions and is clinically viable (S5 at

36:35).

**(3) Reasonable Accommodation is Uncontested.** The State does not oppose conditional release

and has not identified any resource-related barriers to implementation (S3 at 01:50). The State's

own proposed plan, submitted as Exhibit 413 (ECF No. 55 at STATE_PROD_002295), mirrors

many elements of Plaintiff's proposed placement. At no point has the State offered an in-hospital

alternative endorsed by clinicians as satisfying the ADA's least restrictive standard.

Continued confinement under these circumstances—where the institutional setting is neither

medically necessary nor desired by the individual—violates the ADA. The PSRB's failure to

terminate jurisdiction or implement the approved release plan constitutes unlawful segregation

under *Olmstead*.

**B. Claim 2: Due Process under Foucha v. Louisiana, 504 U.S. 71 (1992)**

Plaintiff also asserts a violation of substantive due process under the Fourteenth Amendment. In *Foucha v. Louisiana*, 504 U.S. 71 (1992), the Supreme Court held that the state may not continue to confine a person under civil commitment unless that person is both mentally ill *and* currently dangerous. Commitment based solely on past behavior, speculative risk, or the mere presence of mental illness is constitutionally impermissible.

The PSRB's continued jurisdiction over Plaintiff fails this test on both prongs.

First, while the parties stipulated to the existence of a qualifying mental disorder, the record lacks any evidence that Plaintiff is currently dangerous. Dr. James Peykanu—Plaintiff's attending psychiatrist since 2021—testified that Plaintiff has not engaged in any dangerous behavior since 2022, and described Plaintiff's behavior at the hospital as "exemplary" (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 35:13). When asked specifically whether there had been any incidents of assault or threatening behavior over the past two years, Dr. Peykanu responded unequivocally: "No" (id. at 35:16). He further testified that Plaintiff does not have violent attitudes, does not require cueing, and is "extremely motivated to maintain their mental health" (id. at 33:21–33:35).

Second, even though the PSRB approved conditional release pursuant to the State's own proposed plan (Exhibit 413, ECF No. 55 at STATE_PROD_002295), it simultaneously retained jurisdiction over Plaintiff. This continued legal control is impermissible. Under *Foucha*, a state may not maintain civil commitment—or any custodial authority under a forensic regime—absent clear and convincing evidence of current dangerousness due to mental illness. The Board's

findings acknowledged that no acts of dangerousness had occurred since mid-2022, and the record contains no individualized evidence linking Plaintiff's current condition to any substantial risk of harm (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 10:47; 35:13). Dr. Peykanu testified that Plaintiff's behavior has been exemplary, that they require no staff cueing, and that their insight and motivation are strong and sustained.

In this context, the PSRB's approval of conditional release under the State's proposed plan (Exhibit 413, ECF No. 55 at STATE_PROD_002295) is not merely a transitional step—it reflects an institutional acknowledgment that Plaintiff can be safely treated in the community. While conditional release does not itself terminate PSRB jurisdiction, it strongly affirms that the legal standard for discharge has been met. Under ORS 161.346(1)(a), the Board is required to discharge a person once they are no longer a substantial danger to others as a result of mental disorder. In this case, however, the endorsement of conditional release—paired with the undisputed absence of current dangerousness—triggers the statutory obligation to discharge, not merely supervise, making continued jurisdiction improper under ORS 161.346(1)(a).

Moreover, Plaintiff's proposed plan (ECF No. 16.1 Exh A) would, upon discharge, be updated and used as a guide for safe community living with their family, rather than as a condition of continued legal supervision. The support structures in place—including residence with family members who have personal experience managing bipolar disorder, and engagement with local mental health care in Florida—mirror those contemplated in the State's plan. Dr. Peykanu testified that Plaintiff is "extremely motivated to maintain... their mental health" and is deeply engaged in self-monitoring and treatment (February 26, 2025 Hearing Transcript, ECF No. 50

PAGE 7 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

Exh A, S5 at 33:24; 29:22). When asked about risk management, he analogized Plaintiff's mental illness to diabetes:

> "Self-monitoring and awareness, insight, and engagement with treatment are the
> hallmarks of someone that typically is able to manage an illness well... You know,
> it's like diabetes—if a person is aware of their sugars, is good at monitoring them...
> they can live a normal, healthy life" (id. at 29:57).

The Constitution does not permit indefinite commitment based on hypothetical concerns or desire for continued oversight. Once dangerousness no longer exists, the state's authority ends. To retain jurisdiction over an individual solely because they might hypothetically relapse—despite robust evidence of stability and a well-supported discharge plan—is to impose punishment under the guise of care. This is precisely the constitutional violation *Foucha v. Louisiana*, 504 U.S. 71 (1992), forbids.

Moreover, Dr. Peykanu's testimony does not support the Board's decision. While he acknowledged that future manic episodes are "inevitable" over a lifetime, he emphasized Plaintiff's ability to detect prodromal symptoms and intervene early through voluntary treatment (id. at 28:48–29:57). The Board ignored these protective factors, substituting institutional skepticism for individualized clinical judgment.

Plaintiff's psychiatric condition is well-managed, their insight and self-monitoring are intact, and their treating professionals endorse release. Under *Foucha*, continued confinement is unconstitutional when current dangerousness is lacking. The Board's decision to extend

PAGE 8 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

jurisdiction—despite this clear factual record—violates Plaintiff's fundamental liberty interests protected by the Due Process Clause.

## II. GOVERNING LEGAL STANDARD

Under ORS 161.346(1)(a), the Psychiatric Security Review Board "shall order the person discharged" if it finds that the individual is no longer affected by a qualifying mental disorder, or, if still affected, "no longer presents a substantial danger to others." This is a mandatory discharge standard, not a discretionary one. Once current dangerousness ceases to exist, jurisdiction must be terminated.

The federal due process standard aligns with this statutory command. In *Foucha v. Louisiana*, 504 U.S. 71 (1992), the Supreme Court held that civil commitment is unconstitutional unless the individual is both mentally ill and currently dangerous. The mere presence of a mental disorder is insufficient. Commitment must be grounded in individualized findings of present risk, not historical behavior or generalized concerns about relapse.

Together, these legal authorities make clear: once Plaintiff no longer poses a substantial danger as a result of mental disorder, the PSRB has no lawful basis to retain jurisdiction, regardless of administrative preferences or theoretical future contingencies.

## III. UNDISPUTED FACTS SUPPORTING DISCHARGE

### A. Medical and Legal Chronology

Plaintiff Preston Berman was placed under the jurisdiction of the Psychiatric Security Review Board on December 8, 2010, following a judgment of Guilty Except for Insanity in Deschutes

County Circuit Court for Arson I, Burglary II, and eighteen counts of Reckless Burning (Commit Order, ECF No. 23-1 Dec of JS Exh 1; ECF No. 55 at STATE_PROD_000001). The commitment term is set to expire on March 4, 2030.

Plaintiff was hospitalized at Oregon State Hospital (OSH) from 2010 through 2015, during which they engaged in multi-phase forensic and psychiatric treatment. By December 2015, having demonstrated clinical stability and structured goal attainment, Plaintiff was conditionally released into the community under the supervision of Cascadia Behavioral Healthcare.

From 2015 to 2019, Plaintiff successfully maintained conditional release, with restored driving privileges, medication compliance, and monthly extended travel to visit family in Florida—privileges that were approved and completed without incident (ECF No. 55 at STATE_PROD_001005). After a brief hospitalization in 2019, Plaintiff was again released in 2020 and lived independently in the community for more than a year. In late 2021, they experienced psychiatric decompensation during a commercial flight, resulting in revocation and return to OSH. While no physical harm occurred, the incident raised significant clinical concern and was attributed to subtherapeutic lithium levels and insufficient blood level monitoring, as discussed further in Section III.B.

Following a lithium-related psychiatric relapse in late 2021, Plaintiff has been continuously hospitalized at OSH. During this most recent hospitalization, they have demonstrated exemplary conduct, high insight, and full engagement with treatment. As set forth in detail in Section III.B, each revocation was linked to medical and pharmacologic causes—not to willful noncompliance or violence—and Plaintiff has shown sustained recovery since mid-2022.

PAGE 10 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

**B. Clinical Course and Revocations**

Plaintiff has demonstrated long-term clinical progress, punctuated by two episodes of psychiatric destabilization during otherwise successful periods of conditional release—both of which were caused or exacerbated by clinical factors, not noncompliance or dangerous conduct.

The first conditional release, granted in December 2015, lasted nearly four years and included regular medication adherence, independent living, restored driving privileges, and multiple extended family visits to Florida with PSRB approval. In October 2019, Plaintiff experienced a manic relapse that led to revocation. As confirmed by Charles Blackmar, QMHP Program Manager at Cascadia Behavioral Healthcare, and Plaintiff's then-treating psychiatrist, Dr. Soroush Mohandessi, the relapse was triggered by a prescribed increase in citalopram during a period of depressive symptoms. Plaintiff had been adherent to treatment and sober, but the medication adjustment caused escalating manic symptoms over the course of several weeks. Blackmar explained:

> "Mr. Berman's revocation was the result of a prolonged, acute manic episode… his clinical picture appeared to have been triggered by an increase in his anti-depressant, citalopram… Mr. Berman was medication compliant and provided regular urine drug screens that were negative for illicit substances"
> (Letter from Charles Blackmar, October 30, 2019, ECF No. 55 at STATE_PROD_001391).

The second conditional release, granted in 2020, was similarly stable for over a year. In late 2021, Plaintiff again decompensated after exhibiting symptoms associated with low lithium

blood levels. At the time, Plaintiff's serum lithium measured only 0.5 mEq/L—well below

therapeutic range. Providers had not conducted regular blood level monitoring, and Plaintiff was

not adequately educated on the importance of lithium level stability. The lack of timely

intervention led to a decompensation episode while Plaintiff was flying to Florida, but no one

was harmed. According to documentation and expert review, the destabilization was the result of

an under-monitored medical regimen—not any willful conduct or public threat.

As summarized in Dr. James Peykanu's clinical assessments and testimony, Plaintiff has since

shown sustained stability. There have been no incidents of assaultive, aggressive, or threatening

behavior since mid-2022 (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at

10:47, 35:16). Dr. Peykanu has repeatedly affirmed that Plaintiff is psychiatrically stable,

adherent, insightful, and suitable for community-based treatment with no current indicators of

dangerousness.

**C. Current Psychiatric Stability**

Plaintiff has demonstrated continuous psychiatric stability since June 2022. Dr. James Peykanu,

Plaintiff's attending psychiatrist since 2021, testified that the last significant episode of

psychiatric decompensation occurred in mid-2022, and that since that time, Plaintiff's symptoms

have remained "at bay" (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 04:36).

He emphasized that Plaintiff's mood symptoms in the current period have been limited to

low-grade dysphoria and manageable depression, without recurrence of manic or psychotic

features.

Dr. Peykanu's clinical judgment is supported by his February 20, 2025 Jurisdictional Report, submitted as Exhibit 421. There, he concluded unequivocally that Plaintiff has been psychiatrically stable since June 2022, exhibits consistent medication adherence, demonstrates insight into their condition, and effectively applies coping strategies to manage emerging symptoms (Violence Risk Assessment, February 20, 2025, ECF No. 55 at STATE_PROD_002233).

In his testimony, Dr. Peykanu noted Plaintiff's ability to recognize and respond to early signs of relapse without external prompting. For example, during a recent minor shift in mood, Plaintiff identified subtle internal changes, reported them to staff, and adjusted medication under medical supervision—illustrating a level of insight and proactive self-monitoring characteristic of effective illness management (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 28:48–29:57). He analogized this to diabetes management: "Self-monitoring and awareness, insight, and engagement with treatment are the hallmarks of someone that typically is able to manage an illness well... it's like diabetes—if a person is aware of their sugars, is good at monitoring them... they can live a normal, healthy life" (id. at 29:57).

Institutional records further corroborate this picture. Plaintiff's most recent OSH progress notes reflect full engagement in therapeutic programming, absence of behavioral incidents, and no documented aggression or elopement concerns (OSH Progress Note, September 26, 2023, ECF No. 55 at STATE_PROD_002001).

In totality, the evidence supports a finding of sustained psychiatric stability, voluntary engagement with treatment, and low current risk—facts that compel discharge under ORS

PAGE 13 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

161.346(1)(a) and confirm that continued PSRB jurisdiction is neither clinically warranted nor legally permissible.

**D. Expert Testimony: Dr. James Peykanu**

- Q: Ms. Knodell (S3 at 04:28)

  "Can you give a kind of general update on how you believe Preston's doing?"

- A: Dr. Peykanu (S5 at 04:36)

  "Yes. Preston has been doing very well for the last, uh, several years... the last episode of real bad symptoms was in around June of 2022... But since that June 2022 period, they've really kind of been at bay."

  (*"At bay" refers to manic symptoms subsiding.*)


- Q: Ms. Knodell (S3 at 11:06)

  "Do you... do you believe that Preston does have a qualifying mental health diagnosis?"

- A: Dr. Peykanu (S5 at 11:22)

  "Yes. Bipolar disorder type I."

**a. Absence of Dangerous Behavior**

- Q: Ms. Knodell (S3 at 10:33)

  "Since that time [the 2023 bathroom incident], have there been any other incidents of dangerousness, which may include self-harm, but dangerousness towards others as well?"

- A: Dr. Peykanu (S5 at 10:47)

  "No. And actually, at that time, that was not an incident that I would consider dangerousness toward others in the strict sense... while suicide attempts can at times be reckless or impulsive enough that others could be harmed, this was one where there was no risk that that would have occurred."

  *(Dr. Peykanu's testimony underscores the distinction between self-harm and any public risk.)*

- Statement by Dr. Peykanu (S5 at 13:52)

  "Preston doesn't have... a personality disorder or substance abuse problem that really increases the risk of dangerous behavior toward others. And in addition to that, violent attitudes really aren't there at all for Preston... Preston's way of operating with other people is almost never aggressive in any interpersonal way... they'll often just try and avoid interactions."

  *(This clinical insight supports a low-risk profile not just due to lack of symptoms, but also due to core temperament and interpersonal style.)*

- Q: Mr. Matarazzo (S4 at 35:08)

  "How would you describe my client's overall behavior here at the hospital over the last, let's say, two years?"

- A: Dr. Peykanu (S5 at 35:13)

  "Exemplary."

- Q: Mr. Matarazzo (S4 at 35:16)

  "So no assault or threatening behavior that you're aware of?"

- A: Dr. Peykanu (S5 at 35:16)

  "No."

- Q: Mr. Matarazzo (S4 at 35:21)

  "Does he respond to staff cues?"

- A: Dr. Peykanu (S5 at 35:21)

  "Yes."


- Q: Mr. Matarazzo (S4 at 35:24)

  "How much cueing does my client generally require?"

- A: Dr. Peykanu (S5 at 35:24)

  "None."

**b. Current Risk Management and Insight**

- Q: Mr. Matarazzo (S4 at 28:39)

  "Do you have an opinion as to whether my client is able to describe their warning

  signs and symptoms related to their mental illness?"

- A: Dr. Peykanu (S5 at 28:48)

  "Yeah. I mean, just, for example, on Monday, some pretty subtle signs that I

  wouldn't have necessarily noticed... Preston was talking a little faster than

  average... Preston is more aware of their internal state than people outside of the

  experience."

  (*Dr. Peykanu noted that Preston identified and reported internal changes*

*suggestive of early hypomanic symptoms, prompting a timely medication adjustment.*)

- Q: Mr. Matarazzo (S4 at 29:15)

  "And does my client engage in self-monitoring kinds of behaviors?"

- A: Dr. Peykanu (S5 at 29:22)

  "Yes... Very heavily."

- Q: Mr. Matarazzo (S4 at 29:49)

  "In terms of potential for future dangerousness, is that at all significant, the monitoring?"

- A: Dr. Peykanu (S5 at 29:57)

  "Self-monitoring and awareness, insight, and engagement with treatment are the hallmarks of someone that typically is able to manage an illness well... You know, it's like diabetes—if a person is aware of their sugars, is good at monitoring them... they can live a normal, healthy life."

- Q: Mr. Matarazzo (S4 at 27:08)

  "Do you have an opinion as to whether or not he would continue with medication if he was no longer under PSRB jurisdiction?"

- A: Dr. Peykanu (S5 at 27:21)

  "Preston would continue their medications without any—I, I have no doubt about it."

- o   Q: Mr. Matarazzo (S4 at 26:36)

    "Do you have an opinion as to whether or not his insight is dependent upon

    ongoing PSRB jurisdiction?"

- o   A: Dr. Peykanu (S5 at 26:43)

    "I don't think that it's based on that... Preston's natural support network is

    already a network of people that are engaged with mental health and respect the

    fact that mental health treatment is necessary."

### c.   Support for Conditional Release

- o   Q: Ms. Knodell (S3 at 19:07)

    "Do you believe that Preston is ready for a less restrictive facility at this time?"

- o   A: Dr. Peykanu (S5 at 19:13)

    "Yes. I, I very much do."

    *(This opinion followed his confirmation that Preston was actively using*

    *privileges appropriately and had shown sustained stability.)*

- o   Q: Ms. Knodell (S3 at 18:51)

    "What are their current privileges?"

- o   A: Dr. Peykanu (S5 at 18:56)

    "They have all of their on and off-ground privileges as well as risk review has

    granted conditional release readiness and conditional release planning."

    *(Dr. Peykanu confirmed these privileges had been used without issue and*

    *reflected broad institutional support for transitioning to community care.)*

Q: Mr. Matarazzo (S4 at 36:26)

"If he were to be discharged... fully discharged with board jurisdiction, is there a plan or do you have... a sense of what my client would be doing?"

o    A: Dr. Peykanu (S5 at 36:35)

"Preston has stated that if they were discharged from the board, they would go to Florida and likely initially at least live with family, hook into the mental health network and pursue... educational opportunities."

*(He emphasized that Preston has researched community-based treatment options and has natural supports already engaged in mental health care.)*

**d.  Clinical Motivation and Protective Factors**

o    Q: Mr. Matarazzo (S4 at 33:15)

"Do you have an opinion as to whether or not my client is motivated to maintain their mental health?"

o    A: Dr. Peykanu (S5 at 33:21)

"Yes."

o    Q: Mr. Matarazzo (S4 at 33:22)

"And what is that?"

o    A: Dr. Peykanu (S5 at 33:24)

"Preston is extremely motivated to maintain... their mental health."

- o   Q: Mr. Matarazzo (S4 at 33:28)

    "Why? Beyond what you've already testified to, is there anything in addition?"

- o   A: Dr. Peykanu (S5 at 33:35)

    "Preston doesn't particularly enjoy the experience of depression... Preston also

    does not wish to be dead... and has come to terms with... wanting to be alive,

    which is actually a bit of a step forward."

    (*Dr. Peykanu elaborated that this shift reflects not only symptom relief, but also a*

    *renewed connection to purpose and a future outside institutional care.*)


- o   Q: Mr. Matarazzo (S4 at 28:39)

    "Do you have an opinion as to whether my client is able to describe their warning

    signs and symptoms related to their mental illness?"

- o   A: Dr. Peykanu (S5 at 28:48)

    "Preston is more aware of their internal state than people outside of the

    experience."

    (*This underscores Preston's capacity for insight and proactive*

    *self-management—key protective factors for relapse prevention.*)

- o   Statement by Dr. Peykanu (S5 at 28:01)

    "I don't know if the board is aware that a lot of Preston's legal briefs... pretty

    much all of them are written by Preston themselves. And they're actually quite

    good—well reasoned, well thought through, and very clearly formatted as a

    professional. I've recommended that Preston consider legal training and law

    school."

*(Dr. Peykanu noted this in support of Preston's motivation, discipline, and*
*capability to pursue meaningful goals in the community.)*

## IV. ADA VIOLATION – CLAIM 1

**A. Legal Standard**

Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, prohibits public

entities from discriminating against qualified individuals with disabilities in the provision of

services, programs, or activities. The Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581

(1999), clarified that unjustified segregation of persons with mental disabilities constitutes

discrimination under the ADA.

The *Olmstead* Court held that states are required to provide services to individuals with

disabilities in the "most integrated setting appropriate to the needs of qualified individuals." Id.

at 607. This standard is satisfied when (1) treatment professionals determine that community

placement is appropriate, (2) the individual does not oppose such placement, and (3) the

placement can be reasonably accommodated, taking into account the resources available and the

needs of others.

The ADA's integration mandate is implemented through federal regulations requiring public

entities to "administer services, programs, and activities in the most integrated setting

appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

Oregon, through the PSRB, bears a direct obligation to comply with the *Olmstead* standard. The

PSRB's continued jurisdiction over Plaintiff—despite full clinical endorsement of community

PAGE 21 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO.
66) AND RULE 56(f) NOTICE

readiness and the absence of current dangerousness—represents a clear deviation from that obligation. When the State's own professionals determine that an individual can be safely managed in a community setting, and the individual does not object, the State cannot lawfully prolong institutionalization. Doing so constitutes unlawful segregation under the ADA.

**B. No Clinically Endorsed Less Restrictive Alternative Within Hospital**

The ADA's integration mandate requires that individuals with mental disabilities receive treatment in the least restrictive setting appropriate to their needs. In Plaintiff's case, no less restrictive, clinically endorsed alternative existed within the Oregon State Hospital (OSH) prior to 2025. The only viable, integrated setting supported by the treatment team was conditional release to a community-based placement.

Dr. James Peykanu testified that Plaintiff remained on the Leaf 1 unit through 2024 not because of clinical risk, but due to their strong therapeutic relationships, peer support network, and unit cohesion. He explained that moving Plaintiff to the hospital's Bridge program—a transitional step-down unit—was delayed precisely because Leaf 1 had already functioned like a step-down setting, both in structure and privileges (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 43:15).

While on Leaf 1, Plaintiff exercised all available privileges, including off-ground outings, multiple times per week. Dr. Peykanu testified that Plaintiff "was using all their privileges multiple times per week" and "going on outings regularly," further underscoring that their level of functioning was indistinguishable from that of someone in an SRTF (id.). At no point did the

treatment team propose an internal alternative to conditional release as satisfying the requirements of least restrictive care.

Moreover, Exhibit 413 outlines a conditional release plan developed in coordination with Cascadia Behavioral Healthcare, which received full support from OSH clinicians and was unopposed by the State (Exhibit 413, ECF No. 55 at STATE_PROD_002295). This plan included outpatient medication management, mental health services, stable housing, and structured community supports—none of which were clinically available within the hospital environment in an equally integrated format.

The absence of a medically endorsed in-hospital alternative confirms that Plaintiff's continued institutionalization violates the ADA's integration mandate. When a community-based placement is both supported and unopposed, and when no internal alternative offers comparable integration, the State must proceed with discharge—not delay on the basis of administrative convenience.

## C. Prolonged Institutionalization = Segregation

Continued PSRB jurisdiction over Plaintiff—despite clinical approval for community placement—constitutes unlawful segregation under the Americans with Disabilities Act. The integration mandate of *Olmstead v. L.C.*, 527 U.S. 581 (1999), requires states to provide services in the most integrated setting appropriate to the individual's needs. When a person is cleared for community-based care and does not oppose placement, further institutionalization—whether labeled as treatment, supervision, or jurisdiction—amounts to disability-based segregation.

Here, OSH clinicians and the PSRB Risk Review Committee approved Plaintiff for conditional release as early as 2023. Dr. Peykanu testified unequivocally that Plaintiff is "very much" ready

PAGE 23 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

for a less restrictive setting and that their treatment needs can be met safely in the community

(February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 19:13). The conditional release

plan set forth in Exhibit 413, and Plaintiff's own proposed discharge plan (ECF No. 16.1 Exh A),

both demonstrate that an integrated, community-based placement is available and supported.

Plaintiff has actively pursued this path and does not oppose placement.

Despite this, the PSRB has retained legal control over Plaintiff, effectively prolonging

institutional confinement under the guise of continued jurisdiction. This continued

control—absent any individualized evidence of current dangerousness—amounts to a form of

segregation that is presumptively unlawful under the ADA. As the *Olmstead* Court recognized,

unjustified isolation not only stigmatizes people with mental disabilities but also denies them the

opportunity to participate fully in community life. That is precisely the effect of the PSRB's

actions here.

## V. DUE PROCESS VIOLATION – CLAIM 2 (*Foucha*)

The continued commitment of Plaintiff violates the Fourteenth Amendment's guarantee of

substantive due process. Under *Foucha v. Louisiana*, 504 U.S. 71 (1992), a state may not detain a

person under civil commitment unless that individual is both mentally ill *and* currently

dangerous. The mere existence of a qualifying mental disorder is insufficient to justify

confinement. There must be present-tense evidence of substantial danger to others directly

caused by the mental illness.

Here, the record establishes that Plaintiff does not meet that constitutional standard. Dr. James

Peykanu, Plaintiff's treating psychiatrist, testified unequivocally that Plaintiff has exhibited no

PAGE 24 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

dangerous behaviors since mid-2022 and that there have been no incidents of assaultive or threatening conduct during the past two years (February 26, 2025 Hearing Transcript, ECF No. 50 Exh A, S5 at 10:47, 35:16). He further explained that Plaintiff does not suffer from a comorbid personality disorder or substance use condition that would elevate baseline risk, and that they lack violent ideation or interpersonal aggression:

> "Preston's way of operating with other people is almost never aggressive in any interpersonal way... they'll often just try and avoid interactions" (id. at 13:52).

Despite this, the PSRB continues to exercise jurisdiction, citing the structure and supervision available at OSH. This rationale conflates environmental control with individual dangerousness—exactly the type of institutional dependency *Foucha* condemns. The Constitution requires individualized findings of current risk; it does not permit continued confinement based on hypothetical concerns about how a person might function outside of a structured setting.

Dr. Peykanu directly rebutted this logic. He emphasized that Plaintiff's insight and self-management are not conditional on PSRB supervision or hospital structure. When asked whether Plaintiff would remain treatment-compliant if discharged, he responded:

> "Preston would continue their medications without any—I, I have no doubt about it" (id. at 27:21).

And when asked about the role of insight in managing risk, he described Plaintiff's proactive engagement with remarkable clarity:

PAGE 25 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

"Preston is more aware of their internal state than people outside of the experience...
self-monitoring and awareness, insight, and engagement with treatment are the
hallmarks of someone that typically is able to manage an illness well" (id. at 28:48,
29:57).

These statements confirm that Plaintiff is safe *because* of their own sustained insight and
voluntary treatment—not because of external controls. The PSRB's continued control in the
absence of current dangerousness violates *Foucha*, as well as ORS 161.346(1)(a), which codifies
the same substantive standard.

## VI. RESPONSE TO RULE 56(f) NOTICE

### A. No Material Dispute on Core Facts

There is no genuine dispute of material fact as to the key clinical and legal issues in this case.
Defendants have not contested Plaintiff's psychiatric stability, consistent medication adherence,
or high-level treatment engagement. Nor have they disputed that Plaintiff meets the criteria for
conditional release.

Dr. James Peykanu, the State's own witness and Plaintiff's treating psychiatrist, testified that
Plaintiff has not demonstrated any dangerousness since mid-2022, requires no staff cueing, and
responds appropriately to early warning signs of mood shifts (February 26, 2025 Hearing
Transcript, ECF No. 50 Exh A, S5 at 04:36, 10:47, 28:48–29:57, 35:16). These facts are
reinforced by the most recent OSH progress notes and the Board's own Risk Review Committee
findings, which concluded that Plaintiff was conditionally release ready and identified no
behavioral contraindications (Exhibit 369, ECF No. 55 at STATE_PROD_002113–002118).

PAGE 26 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO.
66) AND RULE 56(f) NOTICE

Moreover, Defendants expressly declined to oppose the conditional release plan prepared by
Cascadia Behavioral Healthcare and supported by OSH clinicians (Exhibit 413, ECF No. 55 at
STATE_PROD_002295). At hearing, the Assistant Attorney General stated that "the state… does
not object to the conditional release plan that's been offered" (February 26, 2025 Hearing
Transcript, ECF No. 50 Exh A, S3 at 01:50).

In light of this record, the critical factual predicates for discharge—namely, that Plaintiff is no
longer a substantial danger to others due to mental disorder and can be safely treated in the
community—are not in dispute. As a result, the case presents a pure legal question: whether the
PSRB may retain jurisdiction despite the absence of current dangerousness. Under ORS
161.346(1)(a) and *Foucha*, it may not.

**B. Legal Questions Predominate**

Because the material facts are undisputed, the remaining issues before the Court are purely legal.
The central question is whether the Psychiatric Security Review Board can continue to assert
jurisdiction over Plaintiff despite meeting the statutory standard for discharge under **ORS
161.346(1)(a)**—specifically, that Plaintiff is no longer a substantial danger to others as a result of
mental disorder.

This is not a case requiring credibility determinations or factual development. The PSRB's own
record—including clinical testimony, institutional documentation, and the State's formal
positions—confirms that Plaintiff has satisfied all conditions for release. Whether continued
jurisdiction under these circumstances is lawful is a question of statutory construction and

constitutional interpretation, governed by *Foucha v. Louisiana*, 504 U.S. 71 (1992), and the ADA's integration mandate.

Accordingly, summary judgment is not only appropriate—it is legally compelled.

## VII. CONCLUSION

The record in this case is clear, comprehensive, and undisputed. Plaintiff Preston Berman has not engaged in dangerous behavior since mid-2022, has exhibited exemplary conduct in a structured treatment setting, and has earned the full support of their treating psychiatrist and OSH's Risk Review Committee for conditional release. Plaintiff's insight, medication adherence, and self-monitoring practices are strong and consistent, and the existing clinical consensus confirms that Plaintiff no longer presents a substantial danger to others due to mental disorder.

Under ORS 161.346(1)(a), the PSRB is required—not merely permitted—to order discharge when a person no longer meets the legal criteria for continued jurisdiction. The State has not offered any individualized evidence of current dangerousness and, in fact, does not oppose the proposed conditional release plan. Retaining jurisdiction under these circumstances is both statutorily impermissible and constitutionally infirm. As established in *Foucha v. Louisiana*, 504 U.S. 71 (1992), continued commitment without current dangerousness violates the Due Process Clause of the Fourteenth Amendment.

Moreover, by maintaining institutional control over Plaintiff when community-based treatment is clinically endorsed, feasible, and not opposed, the PSRB is violating the integration mandate of Title II of the Americans with Disabilities Act, as interpreted in *Olmstead v. L.C.*, 527 U.S. 581 (1999). No less restrictive, clinically appropriate alternative within the hospital has been

PAGE 28 - PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE

proposed, and both Plaintiff's personal plan and the State's plan demonstrate that safe reintegration is possible in a community setting.

Accordingly, there are no genuine disputes of material fact. The remaining questions are purely legal, and the law requires discharge.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. **GRANT Plaintiff's Motion for Preliminary Injunction**;

2. **GRANT Summary Judgment in Plaintiff's favor** pursuant to Rule 56 of the Federal Rules of Civil Procedure;

3. **ORDER** that the Psychiatric Security Review Board immediately discontinue its jurisdiction over Plaintiff pursuant to **ORS 161.346(1)(a)**, on the ground that Plaintiff no longer presents a substantial danger to others due to mental disorder;

4. **DECLARE** that continued jurisdiction by the PSRB violates **the Due Process Clause of the Fourteenth Amendment** and the **integration mandate of Title II of the Americans with Disabilities Act**;

5. **ENJOIN** the PSRB from exercising any further authority, supervision, or legal control over Plaintiff based on the current record;

6. **GRANT** such other and further relief as the Court deems just and proper.

DATED: May 21, 2025.


Respectfully submitted,


_s/ Preston Berman_
PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Telephone: (503) 947-3764

Plaintiff, appearing Pro Se

## CERTIFICATE OF SERVICE

I certify that on May 21, 2025, I served the foregoing PLAINTIFF'S SUPPLEMENTAL

BRIEF IN RESPONSE TO ORDER (ECF NO. 66) AND RULE 56(f) NOTICE upon the parties

hereto by the method indicated below, and addressed to the following:


DAN RAYFIELD                              ____ HAND DELIVERY
Attorney General                          ____ MAIL DELIVERY
JILL SCHNEIDER #001619                     ____ OVERNIGHT MAIL
Senior Assistant Attorney General         ____ TELECOPY (FAX)
JAMES M. AARON #132865                     _X_ E-MAIL
Assistant Attorney General                ____ E-SERVE
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Jill.Schneider@doj.oregon.gov
Email: James.Aaron@doj.oregon.gov

Attorneys for Defendants



DATED: May 21, 2025.                Respectfully submitted,

                                    s/ Preston Berman
                                    PRESTON BERMAN
                                    2600 Center St. NE
                                    Salem, OR 97301-2669
                                    Telephone: (503) 947-3764


                                    Plaintiff, appearing Pro Se